ALEX J. TRAMONTANO (276666)
GINA M. SERRA (361172)
**RIGRODSKY LAW, P.A.**
1091 N. Palm Canyon Drive, Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-5746
Facsimile: (302) 654-7530
ajt@rl-legal.com
gms@rl-legal.com

*Counsel for Plaintiff Mark LeRiger*

[*Additional Counsel Listed Below*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK LERIGER, Derivatively on Behalf of Nominal Defendant CORCEPT THERAPEUTICS INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH K. BELANOFF, WILLIAM GUYER, GARY CHARLES ROBB, SEAN MADUCK, JAMES N. WILSON, GREGG ALTON, G. LEONARD BAKER, JR., GILLIAN M. CANNON, DAVID L. MAHONEY, JOSHUA M. MURRAY, KIMBERLY PARK, and DANIEL N. SWISHER, JR.,<br><br>Defendants,<br><br>and<br><br>CORCEPT THERAPEUTICS INCORPORATED,<br><br>Nominal Defendant. | Case No. _____<br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Mark LeRiger ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Corcept Therapeutics Incorporated ("Corcept" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Corcept, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this shareholder derivative action on behalf of Corcept against certain officers and members of the Company's Board for breaches of their fiduciary duties as set forth below.

2.    The claims asserted herein are alleged against certain of the Company's officers and directors (collectively, "Defendants" or the "Individual Defendants") and arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder, as well as state law fiduciary duty claims. Corcept is named herein as a nominal defendant.

3.    Corcept is a commercial-stage pharmaceutical company focused on the development of medications to treat severe endocrinologic, oncologic, metabolic and neurologic disorders by modulating the effects of the hormone cortisol. One of its lead new product candidates is relacorilant, which is being developed for multiple indications, including as a treatment for patients with hypercortisolism (also known as "Cushing's syndrome").

/ / /

/ / /

- 1 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

4.      Throughout the Relevant Period,[1] Defendants represented that the key clinical trials supporting the use of relacorilant as treatment for patients with hypercortisolism were "powerful support" for the New Drug Application ("NDA") that Corcept submitted to the U.S. Food and Drug Administration ("FDA") for this indication. Defendants also stated that they had communicated with the FDA about this NDA and were confident in submitting the NDA, foreseeing no impediments to approval. Toward the latter part of the Relevant Period, Defendants repeatedly told investors that "relacorilant is approaching approval." As a result of these representations, the price of Corcept common stock traded at artificially inflated prices throughout the Relevant Period.

5.      Defendants' representations that the relacorilant NDA was supported by powerful evidence, that it was approaching approval, and that they had no concerns about the FDA's review were false. In truth, the FDA had repeatedly raised concerns about the adequacy of the clinical evidence supporting the NDA and, as a result, there was a known material risk that Corcept's relacorilant NDA would not be approved.

6.      The truth emerged on December 31, 2025, when Corcept revealed that the FDA had issued a Complete Response Letter ("CRL") regarding the NDA for relacorilant as a treatment for patients with hypercortisolism. The press release issued by the Company stated that the FDA had "concluded it could not arrive at a favorable benefit-risk assessment for relacorilant without Corcept providing additional evidence of effectiveness." The press release quoted Defendant Belanoff as stating that "[w]e are surprised and disappointed by this outcome." As a result of this disclosure, the price of Corcept common stock declined by $35.40 per share, or 50.4%.

7.      Then, on January 30, 2026, the FDA published a redacted copy of the CRL. The CRL detailed the FDA's concerns with the relacorilant NDA, including concerns that the clinical studies that were submitted as part of the NDA were not sufficient evidence of relacorilant's efficacy for the proposed indication. The CRL also noted that, during pre-submission meetings,

---

[1]      The capitalized term "Relevant Period" is defined herein as the period from October 31, 2024 through December 30, 2025, inclusive.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the FDA informed Corcept "on several occasions" of its "concerns about the adequacy of the clinical development program," and had warned the Company "to expect significant review issues," if it submitted the application.

8. As a result of Defendants' actions detailed herein, and the precipitous decline in the market value of the Company's common stock, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the securities class action captioned *Allegheny County Employees' Retirement System v. Corcept Therapeutics Incorporated, et al.*, No. 3:26-cv-1525 (N.D. Cal.) (the "Securities Class Action"), and reputational harm.

9. In addition, as a consequence of their breach of fiduciary duties, the Individual Defendants have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## II.    JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, over the claims asserted herein for violations of Section 10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

11. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Corcept's principal executive office is located in Redwood City, California, which is situated in this District, and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

14. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**III.    PARTIES**

**Plaintiff**

15.    Plaintiff is, and has been at all relevant times, a shareholder of Corcept.

**Nominal Defendant**

16.    Nominal Defendant Corcept is a pharmaceutical company incorporated under the laws of the State of Delaware, and maintains its principal executive offices at 101 Redwood Shores Parkway, Redwood City, California.[2] Corcept common stock trades on NASDAQ under the ticker symbol "CORT." As of October 23, 2025, Corcept had over 105 million shares of common stock outstanding, owned by thousands of investors.[3]

**Individual Defendants**

17.    Defendant Joseph K. Belanoff ("Belanoff") is a co-founder of the Company and has served as Corcept's Chief Executive Officer and President at all relevant times.

18.    Defendant William Guyer ("Guyer") is, and was at all relevant times, Corcept's Chief Development Officer.

19.    Defendant Gary Charles Robb ("Robb") is, and was at all relevant times, Corcept's Chief Business Officer and Secretary.

20.    Defendant Sean Maduck ("Maduck") is, and was at all relevant times, the President of Corcept's Endocrinology division.

21.    Defendant James N. Wilson ("Wilson") has served as a director and Chairman of the Board of Corcept since 1999. Wilson served as a director at all relevant times.

/ / /

---

[2]    Corcept Therapeutics Inc., Annual Report (Form 10-K) at 1, https://www.sec.gov/Archives/edgar/data/0001088856/000162828026011091/cort-20251231.htm (filed Feb. 24, 2026) (hereinafter "2025 10-K").

[3]    2025 Proxy at 2. See also Corcept Therapeutics Inc., Proxy Statement (Form DEF 14A) at 2, https://www.sec.gov/Archives/edgar/data/0001088856/000162828025019942/cort-20250424.htm (filed Apr. 25, 2025) (hereinafter "2025 Proxy").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

22.     Defendant Gregg Alton ("Alton") has served as a director of Corcept since March 2020 and served as a director at all relevant times.

23.     Defendant G. Leonard Baker, Jr. ("Baker") has served as a director of Corcept since 1999 and served as a director at all relevant times.

24.     Defendant Gillian M. Cannon ("Cannon") has served as a director of Corcept since November 2020 and served as a director at all relevant times.

25.     Defendant David L. Mahoney ("Mahoney") has served as a director of Corcept since July 2004 and served as a director at all relevant times.

26.     Defendant Joshua M. Murray ("Murray") has served as a director of Corcept since June 2021 and served as a director at all relevant times.

27.     Defendant Kimberly Park ("Park") has served as a director of Corcept since September 2019 and served as a director at all relevant times.

28.     Defendant Daniel N. Swisher, Jr. ("Swisher") has served as a director of Corcept since June 2015 and served as a director at all relevant times.[4]

29.     Defendants referenced in paragraphs 17 through 28 are herein referred to as the "Individual Defendants."

**Fiduciary Duties of the Individual Defendants**

30.     By reason of their positions as officers and/or directors of Corcept, and because of their ability to control the business and corporate affairs of Corcept, the Individual Defendants owed Corcept and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Corcept in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Corcept and its shareholders so as to benefit all shareholders equally.

/ / /

---

[4]     2025 Proxy at 3-9 (providing biographical information for all Individual Defendants, including tenure dates and committee memberships).

- 5 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

31.     Each director and officer of the Company owes to Corcept and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Corcept, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.     To discharge their duties, the officers and directors of Corcept were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

34.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Corcept, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

35.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's regulatory affairs, clinical development programs, and FDA interactions, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the

Company's common stock would be based upon truthful, accurate, and fairly presented information.

36.     To discharge their duties, the officers and directors of Corcept were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Corcept were required to, among other things: (a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with applicable laws and regulations; (b) conduct the affairs of the Company in an efficient, business-like manner so as to maximize the value of the Company's stock; (c) remain informed as to how Corcept conducted its operations, including the status of its regulatory submissions to the FDA, and upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith and to take steps to correct such conditions or practices; (d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Corcept; (e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Corcept's operations would comply with all applicable laws and Corcept's regulatory representations to investors would be accurate; (f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees; and (g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

37.     Each of the Individual Defendants further owed to Corcept and the shareholders the duty of loyalty requiring that each favor Corcept's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

38.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Corcept and were at all times acting within the course and scope of such agency.

39.     Because of their advisory, executive, managerial, and directorial positions with Corcept, each of the Individual Defendants had access to adverse, non-public information about the Company, including, inter alia, the FDA's concerns regarding the relacorilant NDA expressed during pre-submission meetings.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Corcept's Code of Business Conduct and Ethics**

40.    Corcept has adopted a Code of Ethics (the "Code") promulgated by the Board pursuant to Section 406 of the Sarbanes-Oxley Act of 2002 and the rules of the SEC promulgated thereunder. The Code applies to all employees, officers, and directors of the Company. The Code requires that all such persons: (i) act with honesty and integrity, ethically handling actual or apparent conflicts of interest in personal and professional relationships; (ii) "produce or cause to be produced, full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications"; and (iii) comply with applicable governmental laws, rules and regulations. The Code further requires that all violations be promptly reported to the Company's Audit Committee, and that any waiver of the Code for a senior financial officer, executive officer, or member of the Board must be in writing, addressed to the Audit Committee, and disclosed promptly on Form 8-K.[5] By causing or permitting the issuance of materially false and misleading statements regarding the prospects for FDA approval of the relacorilant NDA while in possession of material non-public information, namely, the FDA's repeated warnings during pre-submission meetings that the clinical development program was inadequate and that significant review issues were to be expected, the Individual Defendants violated the Code's requirements of honest and ethical conduct and full, fair, and accurate disclosure. By selling over $25 million, $27 million, and $15 million in Company stock, respectively, at prices artificially inflated by their own misrepresentations, Defendants Belanoff, Maduck, and Guyer failed to ethically handle actual conflicts of interest between their personal financial interests and the interests of the Company and its shareholders, in violation of requirement (i) of the Code, and failed to comply with applicable securities laws governing insider trading, in violation of requirement (iii).

/ / /

/ / /

---

[5]    Corcept Therapeutics Inc., Code of Ethics (Exhibit 14.1 to Annual Report on Form 10-K), https://www.sec.gov/Archives/edgar/data/0001088856/000119312504045249/dex991.htm (available at https://ir.corcept.com/corporate-governance) (hereinafter "Code of Ethics").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Corcept's Audit Committee Charter**

41.    Corcept's Audit Committee operates pursuant to a written charter adopted by the Board (the "Audit Committee Charter"). The Audit Committee Charter is available on the Company's website. Pursuant to the Audit Committee Charter, the purpose of the Audit Committee is to oversee the accounting and financial reporting processes of the Company and audits of its financial statements. The responsibilities of the Audit Committee include: (i) appointing and providing for the compensation of the Company's independent registered public accounting firm; (ii) reviewing the scope and results of independent audits; (iii) reviewing and evaluating internal accounting policies; (iv) approving all professional services to be provided to the Company by its independent accounting firm; (v) overseeing the management of risks relating to accounting matters, financial reporting, and SEC compliance; and (vi) overseeing cybersecurity matters and meeting regularly with Corcept management regarding the same. The Audit Committee also receives and investigates reports of violations of the Company's Code of Ethics.[6] During the Relevant Period, the Audit Committee consisted of Defendants Alton, Cannon, Mahoney, and Murray. As Audit Committee members, each of Alton, Cannon, Mahoney, and Murray had specific oversight obligations over the accuracy and completeness of the Company's public disclosures and SEC filings, including the statements made to investors regarding the FDA's review of the relacorilant NDA. Notwithstanding these obligations, the Audit Committee Defendants failed to ensure that the Company's public statements accurately reflected the FDA's repeated pre-submission warnings that the clinical development program was inadequate and that significant review issues were to be expected, and failed to prevent the dissemination of materially false and misleading statements to investors concerning the prospects for the relacorilant NDA. The Audit Committee Defendants' failure to exercise appropriate oversight in this regard constitutes a breach of the duties imposed upon them by the Audit Committee Charter and their fiduciary obligations to the Company.

/ / /

---

[6]    2025 Proxy at 8-9 (Audit Committee Charter and member designations).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## IV.    **BACKGROUND**

42.    Corcept is a commercial-stage pharmaceutical company focused on the development of medications to treat severe endocrinologic, oncologic, metabolic and neurologic disorders by modulating the effects of the hormone cortisol. Since 2012, Corcept has marketed the drug Korlym for the treatment of patients suffering from hypercortisolism. While Korlym effectively treats hypercortisolism, its active ingredient, mifepristone, terminates pregnancies and causes other adverse effects, including endometrial thickening and vaginal bleeding.[7]

43.    Corcept developed its new proprietary cortisol modulator, relacorilant, to treat hypercortisolism (among other indications) without causing the side effects associated with Korlym. Prior to the start of the Relevant Period, Corcept had completed two Phase 3 clinical trials of relacorilant in patients with hypercortisolism, its pivotal trial "GRACE" and its "GRADIENT" trial, and was preparing to submit an NDA to the FDA for approval of relacorilant for this indication.[8]

## V.    **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**

44.    The Relevant Period begins October 31, 2024, the day after the release of Corcept's results for the third quarter of 2024 and the associated earnings call, which was held after the market closed on October 30, 2024. During the earnings call, Defendant Belanoff told investors that the "results from our GRACE and GRADIENT Phase 3 studies clear the path for relacorilant's new drug application in Cushing's syndrome, which we will submit by year-end." He further represented that the outcomes of the GRACE study "would, on their own, provide powerful evidence for our NDA, but they do not stand on their own," and continued that "GRADIENT's data will support our NDA by providing further evidence of relacorilant's efficacy and safety, confirming what we found in GRACE."

45.    During the same presentation, Defendant Guyer told investors that "we're very confident with submitting an NDA based upon the GRADIENT data," but that "GRADIENT, from

---

[7]    2025 10-K at 1-4.

[8]    2025 10-K at 5–8.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

its inception, was always designed to be supportive of GRACE and GRACE was always going to be our pivotal study and that's our agreement with the FDA." He assured investors that "when you look at the totality of evidence that we see from all of these studies, we believe we have a successful path to a positive NDA for relacorilant that will happen in the coming weeks."

46.     On this call, Defendant Robb spoke about the pre-submission discussions the Company had had with FDA concerning the relacorilant NDA, claiming that "the FDA has made it clear that a single well-controlled study, which we have in the form of our GRACE and the data from GRACE, along with confirmatory evidence, is sufficient to demonstrate a drug safety and efficacy." Defendant Robb further assured investors of "what a good position we're in" with regards to the NDA, claiming that "[i]t's that easy an argument to present to the FDA." Defendant Belanoff similarly commented on Corcept's communications with the FDA, telling investors that "we've talked to the FDA plenty about this program, about all of our programs, and I foresee absolutely no impediments to getting our NDA in."[9]

47.     On December 30, 2024, Corcept announced that it had submitted its NDA for relacorilant as a treatment of endogenous hypercortisolism. The Company's press release stated "Corcept's NDA is based on positive results from the pivotal GRACE trial and confirmatory evidence from the Phase 3 GRADIENT and long-term extension studies and a Phase 2 study in hypercortisolism." It continued that patients in those clinical trials "experienced improvements in a wide array of hypercortisolism's signs and symptoms, with an acceptable safety burden." The press release also quoted Defendant Belanoff as saying "Relacorilant's combination of efficacy and safety give it the potential to become the standard of care for the medical treatment of patients with hypercortisolism."[10]

---

[9]     Corcept Therapeutics Inc., Current Report (Form 8-K) (Exhibit 99.1, Press Release), https://www.sec.gov/Archives/edgar/data/0001088856/000162828024044318/cort-20241030.htm (Oct. 30, 2024) (hereinafter "Q3 2024 8-K"); Compl. ¶¶22–24, *Allegheny Cnty. Emps.' Ret. Sys. v. Corcept Therapeutics Inc.*, No. 3:26-cv-1525 (N.D. Cal. filed Feb. 20, 2026) (hereinafter "Securities Class Action Compl.").

[10]     Corcept Therapeutics Inc., Current Report (Form 8-K), https://www.sec.gov/Archives/edgar/data/0001088856/000119312524286917/d834253d8k.htm (Dec. 30, 2024) [hereinafter "NDA Submission 8-K"]; Securities Class Action Compl. ¶25.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

48.     On February 26, 2025, Corcept released its financial results for the fourth quarter of 2024 and held an earnings call to discuss these results with analysts and investors. During that earnings call, Defendant Belanoff stated that the "positive results from our GRACE, GRADIENT long term extension and Phase 2 studies provide powerful support for successful relacorilant NDA in hypercortisolism."[11]

49.     On May 5, 2025, Corcept released its financial results for the first quarter of 2025 and held an earnings call to discuss those results with analysts and investors. During that earnings call, Defendant Belanoff stated that the NDA "is currently under review with an FDA action date of December 30, 2025," and that it "is progressing towards approval by the end of this year." Defendant Maduck quantified the expected benefits from this supposedly anticipated approval, telling investors that "I believe that in the next three to five years, relacorilant will generate $3 billion to $5 billion in annual revenue in hypercortisolism alone."[12]

50.     On July 31, 2025, Corcept released its financial results for the second quarter of 2025 and held an earnings call to discuss these results with analysts and investors. During that earnings call, Defendant Maduck again told investors that "in the next three to five years, relacorilant will generate $3 billion to $5 billion in annual revenue in hypercortisolism alone," while Defendant Belanoff stated that "relacorilant is approaching approval," and "[w]e expect its approval in hypercortisolism by the end of this year."[13]

51.     On November 4, 2025, Corcept released its financial results for the third quarter of 2025, and held an earnings call to discuss these results with analysts and investors. During that call, Defendant Maduck stated that "I eagerly anticipate relacorilant's approval," and again

---

[11]     Corcept Therapeutics Inc., Current Report (Form 8-K) (Exhibit 99.1, Press Release), https://www.sec.gov/Archives/edgar/data/0001088856/000162828025008131/cort-20250226.htm (Feb. 26, 2025) (hereinafter "Q4 2024 8-K"); Securities Class Action Compl. ¶26.

[12]     Corcept Therapeutics Inc., Current Report (Form 8-K), https://www.sec.gov/Archives/edgar/data/0001088856/000162828025022167/cort-20250505.htm (May 5, 2025) (hereinafter "Q1 2025 8-K"); Securities Class Action Compl. ¶27.

[13]     Corcept Therapeutics Inc., Current Report (Form 8-K), https://www.sec.gov/Archives/edgar/data/0001088856/000162828025036999/cort-20250731.htm (July 31, 2025) (hereinafter "Q2 2025 8-K"); Securities Class Action Compl. ¶28.

reiterated that "[i]n the next three to five years, I believe relacorilant will generate $3 billion to $5 billion in annual revenue in hypercortisolism alone." Defendant Belanoff also assured investors that "[n]ext month, we expect FDA approval of relacorilant for the treatment of hypercortisolism."[14]

52.    The statements in paragraphs 44 through 51 were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, the FDA had told Corcept that it had concerns about the adequacy of the program assessing relacorilant's effectiveness in treating hypercortisolism, including the design of the GRACE study. The FDA had further told Corcept to expect significant issues with the review if Corcept was to submit the NDA. As a result, Defendants' positive statements concerning their interactions with the FDA and their expectations that the relacorilant NDA would be approved were materially false or misleading.

## VI.    THE TRUTH EMERGES

53.    On December 31, 2025, Corcept revealed that the FDA had issued a CRL regarding the NDA for relacorilant as a treatment for patients with hypercortisolism. Specifically, the Company stated that "the [FDA] concluded it could not arrive at a favorable benefit-risk assessment for relacorilant without Corcept providing additional evidence of effectiveness." In the press release announcing that it had received the CRL, Defendant Belanoff is quoted stating that "[w]e are surprised and disappointed by this outcome." This disclosure caused the price of Corcept common stock to decline by $35.40 per share, or 50.4%, from a closing price of $70.20 on December 30, 2025, to a closing price of $34.80 on December 31, 2025.[15]

///

---

[14]    Corcept Therapeutics Inc., Current Report (Form 8-K), https://www.sec.gov/Archives/edgar/data/0001088856/000162828025048814/cort-20251104.htm (Nov. 4, 2025) (hereinafter "Q3 2025 8-K"); Securities Class Action Compl. ¶29.

[15]    Corcept Therapeutics Inc., Current Report (Form 8-K), https://www.sec.gov/Archives/edgar/data/0001088856/000119312525338184/d50993d8k.htm (Dec. 31, 2025) )hereinafter "CRL 8-K"); Securities Class Action Compl. ¶31.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VII.    POST-RELEVANT PERIOD EVENTS

54.    Following the end of the Relevant Period, on January 30, 2026, the FDA published a redacted copy of the CRL. The CRL confirmed that the FDA had "determined that we cannot approve this application in its present form," and detailed the reasons for that determination. This included an explanation of why the FDA found that the evidence from the GRACE and GRADIENT studies was "not sufficient to demonstrate the effectiveness of relacorilant for the proposed indication."

55.    The CRL also revealed that Corcept was expressly warned by FDA of issues with the adequacy of its trials, stating, in relevant part: "During the pre-submission meetings, we informed you on several occasions of our concerns about the adequacy of the clinical development program to assess the effect of relacorilant on hypercortisolism in the intended population including the design of [the GRACE study], and to expect significant review issues if you were to submit your application."[16]

## VIII.    SCIENTER ALLEGATIONS

56.    As alleged herein, the Individual Defendants acted with scienter since the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Numerous facts, including those detailed below, considered collectively, demonstrate that the Individual Defendants knew or recklessly disregarded that they were misrepresenting the prospects of the relacorilant NDA being approved.

57.    First, the Complete Response Letter establishes that the Individual Defendants knew about the FDA's concerns with the relacorilant NDA from the beginning of the Relevant

---

[16]    2025 10-K at 8–9; Securities Class Action Compl. ¶¶32–33. No dedicated Form 8-K was filed for the January 30, 2026 CRL publication; the quoted language is drawn from the redacted CRL as disclosed in the 2025 10-K and the Securities Class Action complaint.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Period, as the FDA informed Corcept of these concerns "on several occasions" during the pre-submission meetings.

58. Second, the relacorilant NDA was crucial to Corcept's business, as the Individual Defendants spoke about it on every conference call with investors, repeatedly emphasized its importance as the next generation of the Company's medication treating hypercortisolism, and professed a deep understanding about the requirements for the NDA to be approved. Individual Defendants repeatedly stated that they expected sales of relacorilant for treatment of hypercortisolism to generate $3 billion to $5 billion in annual revenue in the next 3 to 5 years, which is multiples larger than the Company's revenue guidance for 2025 of $800 to 850 million.[17]

59. Third, capitalizing on Corcept's inflated stock price, Corcept's senior executives reaped massive personal financial gains by selling over $97 million worth of their personally held Corcept shares during the Relevant Period. Specifically, Defendant Belanoff sold over $25 million of his personally held shares at the same time that Defendants were issuing materially false and misleading statements and omissions to investors. Similarly, Defendant Maduck sold over $27 million of his personally held shares and Defendant Guyer sold over $15 million of his personally held shares during the Relevant Period. These sales were suspiciously timed and comprised a material departure from these Defendants' trading behavior in the period directly preceding the Relevant Period.[18]

60. Collectively, these facts give rise to a strong inference of scienter.

/ / /

/ / /

/ / /

---

[17] Q3 2025 8-K (reporting 2025 revenue guidance); Securities Class Action Compl. ¶56.

[18] Statements of Changes in Beneficial Ownership (Form 4) filed by Joseph K. Belanoff, William Guyer, and Sean Maduck with the SEC during the Relevant Period (multiple filings), available at https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001088856&type=4 (hereinafter "Form 4 Filings"); Securities Class Action Compl. ¶49.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

61.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

62.    Corcept is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

63.    Plaintiff is a current shareholder of Corcept and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

64.    A pre-suit demand on the Board of Corcept is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Belanoff, Wilson, Alton, Baker, Cannon, Mahoney, Murray, Park, and Swisher.

65.    Pursuant to Federal Rule of Civil Procedure 23.1, Plaintiff is required to allege with particularity the efforts, if any, made by Plaintiff to obtain the action desired from the directors and the reasons for the failure to obtain the action or for not making the effort. Because demand on the Board is futile and therefore excused, no pre-suit demand has been made. In determining whether demand is excused, the Court applies the three-part test articulated in *United Food & Commercial Workers Union v. Zuckerberg*, 262 A.3d 1034, 1058 (Del. 2021) ("*Zuckerberg*", under which demand is excused as to any director who: (i) received a material personal benefit from the alleged misconduct that is not shared on a pro-rata basis by all shareholders; (ii) faces a substantial likelihood of personal liability on any of the claims asserted; or (iii) lacks independence from a person who satisfies prong (i) or (ii). This is referred to herein as the "*Zuckerberg* test" "*Zuckerberg* prongs" or "*Zuckerberg* factors" Demand is excused if at least five of the nine current directors (a majority) fail this test.

66.    **Defendant Belanoff.** Demand is excused as to Belanoff because he faces a substantial likelihood of personal liability on Counts I through V and received material personal benefits not shared pro rata with all shareholders. Belanoff is the Company's co-founder and has

served as both CEO and a director since Corcept's inception in 1999. As detailed in paragraphs 42–50 above, Belanoff was the primary speaker at every earnings call throughout the Relevant Period, personally made the most significant and direct false statements regarding the prospects for FDA approval of the relacorilant NDA, and personally assured investors that he foresaw "absolutely no impediments" to the NDA while the FDA had already warned the Company "on several occasions" of its concerns about the clinical program. Belanoff also received a material personal benefit by selling over $25 million of his personally held Corcept shares at prices artificially inflated by his own misrepresentations during the Relevant Period, a benefit not shared pro rata with ordinary shareholders. This sale was suspiciously timed and represented a material departure from his pre-relevant-period trading behavior. Belanoff thus satisfies prongs (i) and (ii) of the *Zuckerberg* test and cannot be counted in the denominator for demand purposes.

67.    **Defendant Guyer.** Demand is excused as to Guyer because he faces a substantial likelihood of personal liability on Counts I through V and received material personal benefits not shared pro rata with all shareholders. As Corcept's Chief Development Officer at all relevant times, Guyer was directly responsible for overseeing the Company's clinical development programs and its regulatory interactions with the FDA. Guyer personally appeared on the Company's October 30, 2024 earnings call and specifically addressed the FDA's pre-submission interactions, representing that the Company was "very confident" in submitting the NDA and that their approach was "our agreement with the FDA." These representations directly contradicted the FDA's pre-submission warnings to the Company. Guyer also received a material personal benefit by selling over $15 million of his personally held Corcept shares at artificially inflated prices during the Relevant Period. Guyer is a defendant against whom a litigation demand would be directed. Guyer is not a member of the Board; the three-prong *Zuckerberg* analysis applies to director defendants. However, a majority of the Board cannot disinterestedly evaluate a demand to commence litigation against Guyer because those same director-defendants face a substantial likelihood of personal liability arising from the same course of conduct that is the subject of the claims against Guyer, as alleged in paragraphs 70 through 77 below.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

68.    **Defendant Robb.** Demand is excused as to Robb because he faces a substantial likelihood of personal liability on Counts I through V. As Corcept's Chief Business Officer and Secretary at all relevant times, Robb was responsible for overseeing the Company's commercial and strategic affairs, including investor communications. Robb personally made the most specific and potentially damaging false statement in the record regarding the FDA pre-submission meetings, representing on the October 30, 2024 earnings call that the FDA "has made it clear" that the clinical evidence was sufficient, claiming "[i]t's that easy an argument to present to the FDA," and assuring investors of "what a good position we're in." These representations were directly contradicted by the CRL's disclosure that the FDA had told Corcept "on several occasions" to "expect significant review issues." Robb is a defendant against whom a litigation demand would be directed. Robb is not a member of the Board; the three-prong *Zuckerberg* analysis applies to director defendants. However, a majority of the Board cannot disinterestedly evaluate a demand to commence litigation against Robb because those same director-defendants face a substantial likelihood of personal liability arising from the same course of conduct, as alleged in paragraphs 70 through 77 below.

69.    **Defendant Maduck.** Demand is excused as to Maduck because he faces a substantial likelihood of personal liability on Counts I through V and received material personal benefits not shared pro rata with all shareholders. As President of Corcept's Endocrinology division at all relevant times, Maduck was responsible for the commercial strategy and revenue forecasting for the relacorilant program. Maduck personally made the projections that relacorilant would generate $3 billion to $5 billion in annual revenue in the next three to five years on the May 5, 2025, July 31, 2025, and November 4, 2025 earnings calls, projections he repeated even as the FDA's action date of December 30, 2025 approached and the Company had already been warned of significant review issues. Maduck also received a material personal benefit by selling over $27 million of his personally held Corcept shares, the largest insider sale among all defendants, at artificially inflated prices during the Relevant Period. Maduck is a defendant against whom a litigation demand would be directed. Maduck is not a member of the Board; the three-prong *Zuckerberg* analysis applies to director defendants. However, a majority of the Board cannot

- 18 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

disinterestedly evaluate a demand to commence litigation against Maduck because those same director-defendants face a substantial likelihood of personal liability arising from the same course of conduct, as alleged in paragraphs 70 through 77 below.

70. **Defendant Wilson.** Demand is excused as to Wilson because he lacks independence from Belanoff and because he faces a substantial likelihood of personal liability for breach of fiduciary duty in his capacity as Chairman. Wilson has served as a director and as Chairman of the Board since Corcept's inception in 1999, giving him a 26-year co-directorial relationship with Belanoff that undermines any claim of independence. As Chairman, Wilson bore specific responsibility for the overall governance and oversight of the Company's public disclosures and executive conduct. Wilson's quarter-century tenure as Chairman alongside Belanoff, his oversight of the compensation structure that rewarded Belanoff and other officer-defendants for the Company's purported commercial trajectory, and his failure to take any remedial action in response to the materially false disclosures made throughout the Relevant Period support a substantial likelihood of liability and a lack of independence from Belanoff for purposes of the *Zuckerberg* analysis. Wilson also serves as a member of the Corporate Governance and Nominating Committee, which bears specific responsibility for providing "oversight with respect to corporate governance and ethical conduct by Corcept's directors, officers and employees." In that capacity, Wilson was obligated to ensure compliance with the Company's Code of Ethics, including the requirement to produce full, fair, accurate, timely and understandable disclosure in the Company's SEC filings and public communications. His failure to exercise this independent oversight obligation in the face of the materially false disclosures described herein further supports a substantial likelihood of personal liability under prong (ii) of the *Zuckerberg* test.

71. **Defendant Alton.** Demand is excused as to Alton because he faces a substantial likelihood of personal liability for breach of fiduciary duty arising from his role as Chairman of the Audit Committee. Defendant Alton is designated as an "audit committee financial expert" within the meaning of SEC rules.[19] As detailed in paragraph 39 above, the Audit Committee

---

[19] 2025 Proxy at 8.

Charter charged the Audit Committee with overseeing the accuracy of the Company's public disclosures and SEC filings and the management of risks relating to financial reporting and SEC compliance. Alton's professional background amplifies his liability exposure: as the former General Counsel of Gilead Sciences, Inc., one of the world's largest biopharmaceutical companies, Alton has extensive expertise in pharmaceutical regulatory affairs, FDA interactions, and the disclosure obligations of public pharmaceutical companies. His specialized knowledge rendered him uniquely capable of recognizing that the Company's repeated public assurances about the FDA's approval of the relacorilant NDA were inconsistent with the pre-submission warnings the Company had received, and rendered his failure to ensure accurate disclosure particularly culpable. Alton thus satisfies prong (ii) of the *Zuckerberg* test.

72.     **Defendant Baker.** Demand is excused as to Baker both because he lacks independence from Belanoff and because he faces a substantial likelihood of personal liability in his role on the Compensation Committee. Baker has served as a director of Corcept since 1999, giving him a 26-year co-directorial relationship with Belanoff that mirrors Wilson's and that similarly undermines a claim of independence. As a member of the Compensation Committee, Baker participated in approving the executive compensation packages awarded to Belanoff, Guyer, Maduck, and Robb during the Relevant Period, compensation that was tied to the Company's performance metrics and that benefited from the artificially inflated stock price resulting from the false and misleading disclosures. Baker also serves as a member of the Corporate Governance and Nominating Committee, the same committee chaired by Park that bears specific responsibility for providing oversight with respect to corporate governance and ethical conduct by Corcept's directors, officers and employees. Baker's dual membership on the Compensation Committee and the Corporate Governance and Nominating Committee imposed independent oversight obligations that were breached during the Relevant Period. Baker's longstanding relationships with multiple officer defendants and his role in approving their compensation satisfy the independence and substantial-likelihood-of-liability prongs of the *Zuckerberg* test.

73.     **Defendant Cannon.** Demand is excused as to Cannon because she faces a substantial likelihood of personal liability arising from her dual roles on the Audit Committee and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the Corporate Governance and Nominating Committee. Defendant Cannon is designated as an "audit committee financial expert" within the meaning of Item 407(d)(5) of Regulation S-K and the Exchange Act, as determined by the Board in Corcept's 2025 proxy statement.[20] As a member of the Audit Committee, Cannon bore specific charter-based obligations to oversee the accuracy of the Company's public disclosures and SEC compliance, as described in paragraph 39. Her more-than-30-year career as a senior pharmaceutical executive, including leadership roles at Merck, UCB, and Otsuka, provided her with deep specialized knowledge of FDA drug approval processes, the significance of pre-submission FDA feedback, and the materiality of the FDA's concerns about the relacorilant NDA. This expertise makes her failure to exercise Audit Committee oversight over the false and misleading disclosures particularly culpable and supports a substantial likelihood of liability on Count II. Cannon thus satisfies prong (ii) of the *Zuckerberg* test.

74.     **Defendant Mahoney.** Demand is excused as to Mahoney because he faces a substantial likelihood of personal liability arising from his concurrent membership on both the Audit Committee and the Compensation Committee. Defendant Mahoney is designated as an "audit committee financial expert" within the meaning of SEC rules.[21] As a member of the Audit Committee, Mahoney bore specific charter-based obligations to oversee the accuracy of the Company's public disclosures and SEC compliance. In parallel, as a member of the Compensation Committee, Mahoney participated in approving the executive compensation awarded to Belanoff, Maduck, Guyer, and Robb during the Relevant Period. His combined Audit Committee and Compensation Committee memberships, his designation as a financial expert, and his failure to prevent the dissemination of materially false and misleading disclosures establish a substantial likelihood of personal liability. Mahoney thus satisfies prong (ii) of the *Zuckerberg* test.

75.     **Defendant Murray.** Demand is excused as to Murray because he faces a substantial likelihood of personal liability arising from his role on the Audit Committee. Defendant Murray is designated as an "audit committee financial expert" within the meaning of Item

---

[20]     2025 Proxy at 8.

[21]     *Id.*

407(d)(5) of Regulation S-K and the Exchange Act, as determined by the Board in Corcept's 2025 proxy statement.[22] As a member of the Audit Committee, Murray bore specific charter-based obligations to oversee the accuracy of the Company's public disclosures and SEC filings and to oversee risks relating to financial reporting and SEC compliance. Murray's professional background as a former Managing Director in the Investment Banking Division of Goldman Sachs, where he spent 15 years advising biotechnology and life sciences companies, provided him with substantial expertise in the financial disclosures and investor communications of pharmaceutical companies and the materiality of regulatory milestones such as FDA approval. His failure to exercise Audit Committee oversight over the false disclosures regarding the relacorilant NDA, given his financial and biotech sector expertise, supports a substantial likelihood of personal liability under prong (ii) of the *Zuckerberg* test.

76. **Defendant Park.** Demand is excused as to Park because she faces a substantial likelihood of personal liability arising from her chairmanship of the Corporate Governance and Nominating Committee. As Chair of the Corporate Governance and Nominating Committee, Park had specific responsibility for providing "oversight with respect to corporate governance and ethical conduct by Corcept's directors, officers and employees." This oversight function encompassed the Company's compliance with its Code of Ethics — the very instrument that the Individual Defendants violated by failing to produce "full, fair, accurate, timely and understandable disclosure" in the Company's SEC filings and public communications. Park's prior career in senior pharmaceutical commercial leadership positions at Merck & Co. and Johnson & Johnson, including as Global Vice President of Customer Strategy and Innovation,[23] provided her with the industry knowledge to understand the significance of the FDA's pre-submission warnings and the materiality of those concerns to investors. Her failure to exercise governance and ethics oversight over the false disclosures during the Relevant Period supports a substantial likelihood of personal liability under prong (ii) of the *Zuckerberg* test.

---

[22]  2025 Proxy at 8.

[23]  *Id.* at 6–7.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

77. **Defendant Swisher.** Demand is excused as to Swisher because he faces a substantial likelihood of personal liability arising from his role on the Compensation Committee and his pharmaceutical industry expertise. As a member of the Compensation Committee, Swisher participated in approving the executive compensation awarded to Belanoff, Maduck, Guyer, and Robb during the Relevant Period. Swisher's career in pharmaceutical leadership, including service as President and Chief Operating Officer of Jazz Pharmaceuticals and as Chief Executive Officer and board member of Sunesis Pharmaceuticals for more than 14 years,[24] provided him with deep expertise in the drug development and FDA approval process, rendering his failure to recognize that the Company's repeated public assurances about imminent NDA approval were inconsistent with the FDA's known pre-submission concerns particularly noteworthy. His approval of executive compensation that benefited from the artificially inflated stock price and his failure to take remedial action with respect to the false disclosures support a substantial likelihood of personal liability under prong (ii) of the *Zuckerberg* test.

78. **Demand is futile as to a majority of the Board.** As alleged in paragraphs 66–77 above, at least five of the nine current directors of Corcept - Belanoff (prongs (i) and (ii)), Alton (prong (ii)), Cannon (prong (ii)), Mahoney (prong (ii)), and Murray (prong (ii)) - either face a substantial likelihood of personal liability on the claims asserted herein or lack independence from one who does. This exceeds the majority of the nine-member Board required under *Zuckerberg* to establish that demand is excused for the entire Board. Additionally, Wilson (prong (iii), given his 26-year co-directorial relationship with Belanoff), Baker (prongs (ii) and (iii), given his Compensation Committee role and 26-year co-directorial relationship with Belanoff), Park (prong (ii, given her Corporate Governance Committee chairmanship), and Swisher (prong (ii, given his Compensation Committee role) provide further support for demand futility. No director can disinterestedly and independently evaluate a demand to sue the other Individual Defendants, and therefore no demand was made.

/ / /

---

[24]   2025 Proxy at 5.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

79. The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

80. Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

81. Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it.

82. Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and/or their positions as officers of the Company and their control of the Company. Moreover, Corcept's senior executives collectively sold over $97 million worth of stock (including defendants Belanoff ($25M+), Maduck ($27M+), and Guyer ($15M+)), and personally profited from the artificial inflation of Corcept's stock price during the Relevant Period while making the materially false and misleading statements described herein.

## X. **CLAIMS FOR RELIEF**

### **COUNT I**

*Against The Individual Defendants*

*For Violations of § 10(b) of the Exchange Act and Rule 10b-5*

83. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84. During the Relevant Period, the Individual Defendants carried out a plan, scheme, and course of conduct which intended to and did: (a) deceive the investing public, including purchasers of Corcept common stock; and (b) cause the artificial inflation in the price of Corcept

common stock, thereby harming the Company when the truth was revealed. The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

85.     The Individual Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

86.     The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     The Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the Company and its shareholders in connection with the purchase and sale of Corcept common stock.

88.     The Individual Defendants acted with scienter because they (a) knew that the public documents and statements issued or disseminated in the name of Corcept were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

89.     The Individual Defendants, by virtue of their receipt of information reflecting the true facts relating to Corcept's FDA interactions and the adequacy of the relacorilant NDA, their control over, and/or receipt and/or modification of Corcept's allegedly materially misleading

statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Corcept, participated in the fraudulent scheme alleged herein.

90.    As a result of the foregoing, the market price of Corcept common stock was artificially inflated during the Relevant Period. As a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. In addition, as a consequence of their breach of fiduciary duties, the Individual Defendants have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II

*Against The Individual Defendants*

*For Breach of Fiduciary Duty*

91.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

93.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

94.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by: (a) permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news regarding its regulatory affairs and FDA interactions to the investing public and to the Company's shareholders; (b) allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other public disclosures concerning the prospects for the relacorilant NDA; (c) failing to ensure that adequate internal controls were in place regarding the Company's disclosures to investors concerning its interactions with the FDA; and (d) in the case of Corcept's senior executives exploiting material non-public information by selling over $97 million (including Belanoff

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

($25M+), Maduck ($27M+), and Guyer ($15M+)) in Company stock while the stock price was artificially inflated by their materially false and misleading public statements. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

95.     As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

96.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, damage to the share price of the Company's stock resulting in an increased cost of capital, and reputational harm.

## COUNT III

*Against The Individual Defendants*

*For Aiding and Abetting Breach of Fiduciary Duty*

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

99.     Plaintiff on behalf of Corcept has no adequate remedy at law.

/ / /

/ / /

/ / /

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT IV

*Against The Individual Defendants*

*For Unjust Enrichment*

100.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Corcept.

102.   The Individual Defendants either benefited financially from the improper conduct, or received bonuses, stock options, or similar compensation from Corcept that was tied to the performance or artificially inflated valuation of Corcept, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. Corcept's senior executives collectively sold over $97 million in stock during the Relevant Period. In particular, Defendants Belanoff, Guyer, and Maduck directly and personally profited from the artificial inflation of Corcept's stock price by selling over $67 million in Company stock during the Relevant Period while disseminating materially false and misleading information to the investing public. Defendant Belanoff sold over $25 million, Defendant Maduck sold over $27 million, and Defendant Guyer sold over $15 million in Company stock, each at prices artificially inflated by their own false and misleading statements.

103.   Plaintiff, as a shareholder and a representative of Corcept, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

104.   Plaintiff on behalf of Corcept has no adequate remedy at law.

/ / /

/ / /

/ / /

/ / /

- 28 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT V

*Against The Individual Defendants*

*For Waste of Corporate Assets*

105.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

107.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (a) paying and collecting excessive compensation and bonuses tied to the Company's artificially inflated stock price; (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action; and (c) exposing the Company to regulatory scrutiny and remediation costs arising from the need to re-engage with the FDA regarding the relacorilant NDA.

108.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

109.    Plaintiff on behalf of Corcept has no adequate remedy at law.

## COUNT VI

*Against Defendants Belanoff, Maduck, and Guyer*

*For Disgorgement of Insider Trading Profits Pursuant to Brophy v. Cities Service Co.*

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    Under Delaware law, a corporate fiduciary who possesses material, nonpublic information belonging to the corporation and uses that information by making trades motivated, in whole or in part, by the substance of that information is liable to the corporation for disgorgement of all profits derived from such trading. *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. Ch. 1949); *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 837–38 (Del. 2011). A showing of actual harm to the corporation is not required. *Kahn*, 23 A.3d at 837 ("Even if the

- 29 -

corporation did not suffer actual harm, equity requires disgorgement of that profit."); *see also In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005). The policy of *Brophy* is to prevent unjust enrichment arising from a fiduciary's misuse of confidential corporate information, regardless of whether the corporation was the counterparty to the trades.

112.   Throughout the Relevant Period, Defendants Belanoff, Maduck, and Guyer each possessed material, nonpublic information belonging to the corporation. Specifically, each was aware, by virtue of their senior executive positions and the Company's direct participation in FDA pre-submission meetings, that the FDA had warned Corcept "on several occasions" of its "concerns about the adequacy of the clinical development program" supporting the relacorilant NDA, and had told the Company "to expect significant review issues" if it submitted the application. This information was material because it directly bore on the probability of FDA approval of the relacorilant NDA, which the Company's own executives repeatedly characterized as a $3-5 billion annual revenue opportunity, the most significant regulatory milestone in Corcept's history. Had this information been disclosed, it would have significantly affected the market price of Corcept common stock. This information belonged to Corcept by reason of its confidential nature and the fiduciary relationships of the selling defendants to the Company.

113.   While in possession of this material, nonpublic information, and motivated in whole or in part by the knowledge that the Company's public representations overstated the FDA's receptiveness to the NDA, Defendants Belanoff, Maduck, and Guyer each sold substantial portions of their personally held Corcept common stock at prices artificially inflated by their own false and misleading public statements. Specifically: (a) Defendant Belanoff sold over $25 million of his personally held Corcept common stock during the Relevant Period; (b) Defendant Maduck sold over $27 million of his personally held Corcept common stock during the Relevant Period, the largest individual sale among the selling defendants; and (c) Defendant Guyer sold over $15 million of his personally held Corcept common stock during the Relevant Period.

114.   The adoption of Rule 10b5-1 trading plans by Defendants Belanoff and Guyer does not provide a defense to this equitable claim. The plans were adopted on November 26 and 27,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2024, respectively, after the October 30, 2024 earnings call at which both defendants made materially false representations about the FDA's pre-submission feedback, and at a time when each already possessed the material nonpublic information described herein.[25] The adoption of a trading plan after a fiduciary has received material nonpublic information does not extinguish the equitable *Brophy* obligation to disgorge profits derived from trading on that information. The 10b5-1 plan mechanism provides a basis for affirmative defense to certain claims under the federal securities laws; it does not immunize a fiduciary from the equitable duty not to convert corporate confidential information into personal gain.

115.    The profits realized by Defendants Belanoff, Maduck, and Guyer from their sales of Corcept common stock during the Relevant Period belong in equity to Corcept. By making these trades while in possession of confidential corporate information that exposed the falsity of the Company's own public representations, each of these defendants converted the Company's confidential information into personal financial gain in breach of their duty of loyalty. Public policy will not permit a fiduciary occupying a position of trust and confidence toward the corporation to exploit that position to his own profit, regardless of whether the corporation suffers a loss. *Kahn*, 23 A.3d at 837.

116.    Plaintiff, on behalf of Corcept, seeks disgorgement from Defendants Belanoff, Maduck, and Guyer of all profits and proceeds derived from their sales of Corcept common stock during the Relevant Period while in possession of material, nonpublic information regarding the FDA's concerns about the adequacy of the relacorilant NDA, together with pre-judgment interest thereon. Plaintiff on behalf of Corcept has no adequate remedy at law.

/ / /

---

[25]    Corcept Therapeutics Inc., Annual Report (Form 10-K) at 51 (trading arrangement disclosure), https://www.sec.gov/Archives/edgar/data/0001088856/000162828025008167/cort-20241231.htm (filed Feb. 15, 2025) (hereinafter "2024 10-K") (confirming Belanoff adopted 10b5-1 plan Nov. 26, 2024 and Guyer adopted 10b5-1 plan Nov. 27, 2024); Statement of Changes in Beneficial Ownership (Form 4), William Guyer, Corcept Therapeutics Inc. (filed Dec. 3, 2025), https://www.sec.gov/Archives/edgar/data/1879013/000119312525307282/0001193125-25-307282.txt.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.   Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.   Ordering disgorgement of all proceeds obtained by Defendants Belanoff, Guyer, and Maduck from their sales of Corcept common stock during the Relevant Period while possessing material non-public information regarding the FDA's concerns about the relacorilant NDA;

D.   Awarding punitive damages;

E.   Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.   Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: April 10, 2026                    Respectfully submitted,

                                         **RIGRODSKY LAW, P.A.**

                                         By: __/s/ Alex J. Tramontano_____
                                             Alex J. Tramontano

                                         Alex J. Tramontano
                                         Gina M. Serra
                                         1091 N. Palm Canyon Drive, Suite 9
                                         Palm Springs, CA 92262
                                         Telephone: (760) 406-5746
                                         Facsimile: (302) 654-7530
                                         ajt@rl-legal.com

- 32 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

gms@rl-legal.com

*Counsel for Plaintiff Mark LeRiger*

Joshua H. Grabar
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (267) 507-6085
jgrabar@grabarlaw.com

*Additional Counsel for Plaintiff Mark LeRiger*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Docusign Envelope ID: E95E122E-C88A-4082-8AC6-25B6FB36EAAC

## VERIFICATION OF MARK LERIGER

I, Mark LeRiger, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    4/7/2026

Signed by:

Mark LeRiger

187B3CCEB318432...

Mark LeRiger

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT